T. Robert VERKOUTEREN, Plaintiff,

v.

**BLACKROCK FINANCIAL MANAGEMENT, INC.,**
Defendant.

No. 98 CIV. 4673(WK).

United States District Court,
S.D. New York.

Feb. 4, 1999.

Stanley M. Grossman, Pomerantz Haudek Block Grossman & Gross LLP, Joel C. Feffer, Wechsler Harwood Halebian & Feffer LLP, New York, NY, for Plaintiff.

Seth M. Schwartz, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendant.

MEMORANDUM & ORDER

WHITMAN KNAPP, Senior District Judge.

Defendant Blackrock Financial Management, Inc. has moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss plaintiff's First Amended Complaint for failure to state a claim upon which relief can be granted. For reasons which follow, defendant's motion is granted.

## BACKGROUND

The facts are here presented as alleged in the complaint. Plaintiff T. Robert Verkouteren ("plaintiff") is a shareholder of The Blackrock Target Term Trust Inc., one of twenty-one funds within a fund complex that is advised by defendant Blackrock Financial Management ("defendant"). He brings this action pursuant to the Investment Company Act of 1940 (the "ICA"), as amended, 15 U.S.C. § 80a–35(b). Defendant is a registered investment adviser specializing in fixed income securities. Defendant receives an advisory fee, measured as a fixed percentage of the average weekly net assets in the fund complex, for its services to the funds. Through this action, plaintiff seeks to recover the fees received by defendant pursuant to investment advisory agreements between it and the funds within the complex.

The crux of the complaint is as follows. Plaintiff claims that, contrary to the requirements of Section 10(a) of the ICA, 15 U.S.C. § 80a–10(a) [1], more than 60% of the directors who sit on the boards managing the funds within the complex are "interested" persons within the meaning of the ICA. As a result, Section 15(c)'s requirement that every agreement with an investment adviser be approved by a majority of the independent directors cannot be met due to the fact that all of the fund managers are "interested" under that term's definition in the ICA.[2] The import of the absence of independent directors serving within the fund complex is that the shareholders' interests cannot be adequately safeguarded as contemplated by the ICA.

The complaint further claims that because 40% of the directors of the funds within the complex are not independent, the advisory agreements between the funds and the defendant, pursuant to which defendant receives its advisory fees, are invalid. Plaintiff seeks recovery of those fees under Section 36(b) of the ICA, 15 U.S.C. § 80a–35(b), on behalf of all the funds within the complex.

Finally, the complaint alleges that defendant, by reason of its receipt of funds from invalid advisory agreements, has breached its fiduciary duty to negotiate at arm's-length with the funds in the complex. *See* 15 U.S.C. § 80a–35(b). Accordingly, plaintiff seeks judgment: (1) declaring that defendant violated Sections 10(a), 15(c) and 36(b) of the ICA, and that the advisory agreements are void; (2) awarding damages against defendant, including the return of all fees paid to it by each of the funds as well as related relief; and (3) providing any other relief deemed just and proper by the Court.

As is apparent, the crux of all charges in the complaint is that the seven supposedly independent directors are not truly independent, but actually controlled by defendant.

## DISCUSSION

### A. The ICA and the mutual fund industry

The Investment Company Act of 1940 was enacted by Congress to regulate in-

---

**1.** 15 U.S.C. § 80a–10(a) provides that "[n]o registered investment company shall have a board of directors more than 60 per centum of the members of which are persons who are interested persons of such registered company."

**2.** Section 15(c) of the ICA, 15 U.S.C. § 80a–15(c), entitled "Approval of contract to undertake service as investment adviser or principal underwriter by majority of noninterested directors," provides, in relevant part:

[I]t shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement, written or oral, whereby a person undertakes regularly to serve or act as investment adviser or of principal underwriter for such company, *unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party*, cast in person at a meeting called for the purpose of voting on such approval. (emphasis added).

vestment companies that operate mutual funds. *Kamen v. Kemper Financial Services, Inc.* (1991) 500 U.S. 90, 93, 111 S.Ct. 1711, 114 L.Ed.2d 152. Unlike other corporations, investment companies are typically created and managed by pre-existing entities known as investment advisers. *Daily Income Fund, Inc. v. Fox* (1984) 464 U.S. 523, 536, 104 S.Ct. 831, 78 L.Ed.2d 645. "Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." *Id.* (internal quotation omitted).

Mindful of those potential conflicts, Congress crafted a regulatory scheme in the ICA that placed quantitative and qualitative limits on the relations between advisers and investment companies. Subsequent to the Act's passage, investment companies enjoyed enormous growth, prompting studies on the Act's effectiveness in protecting the interests of investors. *Daily Income,* 464 U.S. at 537, 104 S.Ct. 831. The SEC, having sponsored or authored several such studies, concluded that the Act did not prevent advisers from receiving extraordinary compensation from mutual funds relative to moneys received from other clients. *Id.* The SEC also concluded that unaffiliated directors were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser." *Id.* (quoting Wharton School Study of Mutual Funds (1962), H.R.Rep. No. 2274, 87th Cong., 2d Sess., at 34).

These realities prompted Congress to take further action. In response to legislative proposals submitted by the SEC, the ICA was amended in 1970. Among the amendments was 15 U.S.C. § 80a–10(a), which sought to make the outside directors of investment companies more independent from advisers. *Id.* at 538, 104 S.Ct. 831. Congress rejected an SEC proposal which would have required advisers to accept only "reasonable" fees; it opted instead to impose a fiduciary duty on advisers. *Id.* at 538–39, 104 S.Ct. 831.

Neither Congress (which amended the ICA in 1970) nor the SEC (which often asserts its views regarding the susceptibility of outside directors to the influence of advisers) has taken any action proscribing the use of interlocking boards within mutual fund complexes. In 1994, the SEC amended the proxy rules for registered investment companies to require disclosure of the aggregate compensation received by directors who serve on multiple fund boards. *See Amendments to Proxy Rules for Registered Investment Companies* (1994) SEC Release No. IC–20614, 1994 SEC Lexis 3098. There is no other regulation regarding interlocking boards. Congress and the SEC are both undoubtedly aware that such schemes are rife in the industry, as they are also aware that the shareholders of mutual funds have the authority to set levels of director compensation and to remove directors from office. It is therefore apparent that Congress and the SEC have concluded that the best way to protect shareholders of the various funds (who have the power to elect or discharge directors and fix their compensation) is to make them aware of the relevant facts.

*B. Has the plaintiff's complaint—or his assertions during oral argument—suggested the existence of any fact indicating that the outside directors were "interested persons"?*

For plaintiff's claim that all non-employee directors are "interested" to be established, he must demonstrate that defendant "exercise[s] a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." 15 U.S.C. § 80a–2(9). The definition of "control" within the ICA further notes the following:

Any person who owns beneficially, either directly or through one or more con-

trolled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. *A natural person shall be presumed not to be a controlled person within the meaning of this subchapter.* Any such presumption may be rebutted by evidence, but except as hereinafter provided, shall continue until a determination to the contrary made by the [SEC] by order either on its own motion or on application by an interested person. If an application filed hereunder is not granted or denied by the [SEC] within sixty days after filing thereof, the determination sought by the application shall be deemed to have been temporarily granted pending final determination of the [SEC] thereon...(emphasis ours)

Plaintiff has offered no fact indicating what percentage of the funds, if any, is owned by defendant for purposes of the initial presumption set forth in the quoted paragraph. The second presumption mandates that the non-employee directors in the case at bar, as natural persons, are presumed not to be "controlled" by defendant. Plaintiff has said nothing to indicate whether he attempted to have the SEC take any action in this matter. However, the "non-control" presumption may be rebutted without SEC involvement. *See Securities and Exchange Com'n v. S & P National Corp.* (2d Cir.1966) 360 F.2d 741, 749 (the Commission has determined that it does not have to be first in deciding this issue if a prima facie case for relief can be made out in court).

▮ Starting out, then, with the presumption that the non-employee directors are not "controlled" by defendant, we must determine whether the complaint suggests the existence of evidence to rebut that proposition. A careful review of the complaint reveals that it is almost completely devoid of allegations, conclusory or otherwise, that the directors are in fact controlled by defendant. We could locate only three conclusory claims:

(1) Paragraph 5 states that the independent directors have "largely been co-opted by the adviser, are no longer independent, and have ceased to be able to distinguish between the interests of the adviser and the interests of the shareholders." This conclusory assertion is not supported by any evidence in the complaint.

(2) Paragraph 18 sets forth a table of the compensation received by each of the non-employee directors. The table is supplemented by paragraph 19's assertion that "the foregoing compensation is greater than the collective investment these individuals have in each of the funds within the Fund Complex." As discussed *supra*, this disclosure of director compensation indicates compliance with the outer limits of SEC regulation in this arena. Such information would only be relevant were it to be accompanied by the additional assertion that defendant has the power to set the compensation of the non-employee directors, or that defendant has the authority to remove them. The complaint, however, does not suggest such to be the case. The Funds' most recent proxy statement, referenced in the complaint at ¶ 20, reveals that the non-employee directors are elected by the shareholders, and are paid by the funds themselves. Thus, it appears that defendant has no influence on the level of compensation received by the directors or in the retention of their positions. In support of his contention that the independent directors are controlled by defendant, plaintiff argues in his brief that the directors are "disinclined to jeopardize their cushy jobs and substantial compensation." *Plaintiff's Memorandum in Opposi-*

tion to Defendant's Motion to Dismiss at 9. This argument is not supported by any evidence in the complaint and is belied by the proxy statement.

(3) Paragraph 20 states that "[i]t appears *from the Fund Complex's proxy statement* . . . that the governing boards of all of the funds 'rubber stamp' Blackrock's decisions as it evidently is the practice of all 21 of the governing boards to meet on the same day." (emphasis ours). However, the complaint does not allege a single instance where defendant suggested a course of action which would in any way have prejudiced the shareholders of the funds and therefore should have been resisted by the outside directors.

We will also consider several additional theories of interest advanced at oral argument:

(1) *All funds were created, put in place, and managed by defendant.* (See Transcript of January 13, 1999 Argument at ("Tr. at ___") 13). Plaintiff only states a well-known circumstance with respect to all such funds which has gone unchallenged by either Congress or the SEC.

(2) *Defendant has its chairman and president serve as chairman and president, respectively, of all of the boards within the fund complex.* (Tr. at 13). Again, there is no suggestion of a fact to indicate that defendant's officers ever recommended a course of action which the independent directors should have resisted.

(3) *Defendant initially appointed each of the directors to the boards.* (Tr. at 13). This merely states a fact common to all funds which has not been deemed problematic by the bodies regulating the industry.

(4) *The non-employee directors need only attend three meetings each year in order to receive handsome compensation.* (Tr. at 15). The shareholders have an easy remedy if they are dissatisfied with this arrangement, and it warrants emphasis here: they may vote to change its terms.

(5) *The directors do not meet long enough to engage in a diligent analysis of the issues facing the funds; at board meetings, they simply receive materials prepared by defendant.* (Tr. at 15–16). There is no suggestion that the materials prepared by defendant are insufficient to permit the outside directors to make informed decisions about questions presented to them.

## C. Relevant Authorities

In *Olesh v. Dreyfus Corporation* (E.D.N.Y.1995) 1995 WL 500491, the court was called upon to determine whether the directors of an investment company were "interested," and accordingly "controlled," in circumstances analogous to the case at bar. The *Olesh* plaintiffs had alleged that the directors of Dreyfus funds were interested because: (1) many of the directors of individual Dreyfus funds sat on the boards of several funds (certain fund directors sat on over fifteen boards); (2) directors received substantial aggregate compensation (certain fund directors received over $50,000 annually); (3) directors had ample opportunities to develop personal business relationships with directors of Dreyfus because Dreyfus officers also sat on the fund boards; and (4) Dreyfus had become intimately involved in the marketing and management of the funds, creating an ongoing business relationship with the adviser which clouded the directors' ability to judge Dreyfus objectively. 1995 WL 500491 at *11.

Facing allegations of control that were more compelling than those at bar, the court in *Olesh* refused find the independent directors so dominated as to be "controlled" under the ICA. It noted that

"proof of control demands a presentation of evidence establishing actual domination and operation. Mere influence would fall short of this level of proof." *Id.* at *16. The court ultimately granted plaintiffs leave to amend their complaint in order to add more specific allegations. *Id.*

The SEC, in the *First Australia Fund* No–Action letter, *supra,* cited several factors relevant to the inquiry concerning control over directors:

> (1) selection or nomination of the director by the controlling party; (2) existence of family ties; (3) social relations; (4) former business associations between the director and the controlling person; (5) the amount of time spent by directors at meetings; (6) respective ages; (7) participation in recommending, evaluating, and terminating policies; (8) independent knowledge of corporate affairs; (9) interlocking directors and officers, together with share ownership; and (10) actual domination and operation.

*Id.* at ¶ 77,796.

Plaintiff's complaint implicates only one of the ten concerns, namely interlocking directorships. The additional assertions supplied at oral argument further implicate factors (1) and (5). In our view, the single most important factor is (10), actual domination, which speaks directly to the language of the ICA as well as to the court's holding in *Olesh.* None of the plaintiff's allegations, either in the complaint or at argument, spoke explicitly to that factor.

In conclusion, we find that plaintiff has failed to overcome the statutory presumption that the non-employee directors are not "controlled" as that term is defined in the ICA and interpreted under relevant regulatory and case law. We grant plaintiff thirty days from the date of this order to amend his claim, if he wishes, in order to make evidentiary allegations which would rebut the presumption in concrete terms.

**D. Breach of fiduciary duty claim under Section 36(b)**

15 U.S.C. § 80a–35(b) provides, in relevant part, that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services...paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

■■■ Section 36 of the ICA establishes a federal standard of fiduciary duty in dealings between a mutual fund and its adviser. *Tannenbaum v. Zeller* (2d Cir. 1977) 552 F.2d 402, 416. It is the plaintiff's burden to prove a breach of fiduciary duty under Section 36(b). *Gartenberg v. Merrill Lynch Asset Management, Inc.* (2d Cir.1982) 694 F.2d 923, 927. Plaintiff appears to make two arguments in support of his breach of fiduciary duty claim: (1) defendant subverted the independence of the fund directors by negotiating solely with "interested" directors; and (2) defendant's advisory fees amounted to "fee gouging" compensation from the funds. Plaintiff's first argument is mooted by our conclusion in section B that the complaint does not demonstrate that the non-employee directors were "interested." Plaintiff's conclusion is that a fiduciary breach necessarily flows from his belief that the independent directors are "interested." It must therefore fail. Plaintiff's second argument is similarly without merit.

**D. Standing to recoup damages on behalf of other funds**

Despite the fact that plaintiff is a shareholder in only one of twenty-one funds within the complex, he purports to collect fees paid to defendant by all of the funds. Inasmuch as we have determined that the complaint does not state a cause of action under the ICA, we need not reach the question of his standing to assert it.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss the complaint is granted. Plaintiff is given leave to amend his complaint, if he so chooses, within thirty days.

SO ORDERED.